UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THOMAS MOAK,

      Petitioner,

v.                                  Case No. 8:19-cv-2477-VMC-CPT

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## ORDER

Thomas Moak, a Florida prisoner, timely filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254 (Doc. 1) and a supporting memorandum (Doc. 2). Respondent filed a response opposing the petition. (Doc. 12.) Moak filed a reply. (Doc. 14.) Upon consideration, the petition is **DENIED**.

## I.   Procedural History

A state-court jury convicted Moak of three counts of second-degree murder with a firearm. (Doc. 13-4, Ex. 31.) The state trial court sentenced Moak to three consecutive terms of life in prison. (*Id.*, Ex. 34.) The state appellate court *per curiam* affirmed the convictions and sentences. (*Id.*, Ex. 39.) Moak then sought postconviction relief under Florida Rule of Criminal Procedure 3.850. (*Id.*, Ex. 41.) The state trial court denied Moak's claims, and the state appellate court *per curiam* affirmed the denial of relief. (Doc. 13-5, Ex. 42; Doc. 13-7, Ex. 45.) Moak also filed a petition alleging

ineffective assistance of appellate counsel under Florida Rule of Appellate Procedure 9.141(d). (Doc. 13-7, Ex. 48.) The state appellate court denied Moak's petition. (*Id.*, Ex. 49.)

## II.   <u>Facts; Trial Testimony</u>[1]

On the evening of February 10, 2012, Moak shot and killed his father, mother, and sister in the house they shared. Moak was fifty-eight years old at the time of the murders. He had been living in his parents' house for about nine years, and his sister Renee had moved in approximately two years before the incident. The environment at the house was chaotic, with everyone "bickering all the time." (*Id.*, Ex. 53, p. 232.) The chaos stemmed in large part from Renee's "serious drinking problem." (*Id.*, pp. 231-33.) Moreover, Moak's mother suffered from dementia, which caused her to be "confused" and "combative" at times. (*Id.*, p. 232.) Moak himself suffered from depression, and he was "very anxious" about his son's military deployment in Afghanistan. (*Id.*, Ex. 52, p. 179; *Id.*, Ex. 53, pp. 251-52.) Moak had also gone through a divorce "in the early 2000s," which contributed to his depression. (*Id.*, Ex. 52, p. 182; *Id.*, Ex. 55, p. 420.)

On the night of the murders, Renee was drunk, and Moak's parents were fighting. Moak's mother tried to throw him and his sister out of the house. Fighting of this sort had been going on for a year or two, but Moak later claimed in his statement to police that he had reached a "breaking point" that night. (*Id.*, Ex. 53, p. 284.) Moak

---

[1] This summary is based on the trial transcript.

told everyone in the house to "let it f\*cking go," but they refused. (*Id.*) Moak then asked Renee to leave the house. She refused, saying that Moak was not her husband or father. Moak then retrieved a rifle from under his bed. He returned to his sister, who was sitting on the porch. Moak again asked Renee to leave, telling her to "stop escalating the problem with mom and dad." (*Id.*, p. 286.) Renee told Moak to "mind [his] f\*cking business," whereupon Moak shot her in the head. (*Id.*, p. 287; *Id.*, Ex. 54, p. 370.)

Moak's father began to scream. At the time, he was in the master bedroom with Moak's mother, who was still in bed. Moak shot his father, but the first shot did not "phase [*sic*]" him. (*Id.*, Ex. 53, p. 289.) Moak did not want his father to suffer, so he shot him a second time. Moak then shot his mother as she lay in bed. Moak's parents and his sister died from their gunshot wounds.

Around 11:00 p.m., several deputies arrived on the scene. One of the deputies heard a male voice inside a bedroom saying, "Oh my god. I killed everybody. I should shoot myself." (*Id.*, Ex. 51, pp. 45-46.) Shortly thereafter, another deputy saw Moak with his hands up walking toward the back door, which led onto the porch. This deputy told Moak to keep his hands up and unlock the door. Moak complied, saying, "I'm done. I'm done." (*Id.*, p. 59.) After the deputy took Moak into custody, Moak said, "I did it, I did it. I'm tired of the fighting and the drinking and the bullsh\*t." (*Id.*) He also said, "I killed them all. I killed my parents and my sister. They're better off dead." (*Id.*)

Moak was taken to the police station, where Detective Scott Graber interviewed him at approximately 1:30 a.m. after he waived his *Miranda*[2] rights. During the interview, Moak described the killings, claimed that he had just "snap[ped]," and lamented that he was "going up to the big f*cking house" to "get a f*cking lethal injection." (*Id.*, Ex. 53, pp. 306-07.)

## III.   Standards of Review

### A.    AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed Moak's convictions and sentences, denied his petition alleging ineffective assistance of appellate counsel, and affirmed the denial of postconviction relief without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does

provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

## B.    Ineffective Assistance of Counsel

Moak alleges ineffective assistance of trial and appellate counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id.* at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Moak must show that counsel's alleged error prejudiced the defense, because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, Moak must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The *Strickland* standard applies to claims of ineffective assistance of appellate counsel. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Heath v. Jones*, 941 F.2d 1126,

1130 (11th Cir. 1991). To establish a claim of ineffective assistance of appellate counsel, Moak must show that appellate counsel's performance was objectively unreasonable, and that there is a reasonable probability that, but for this performance, he would have prevailed on his appeal. *Robbins*, 528 U.S. at 285-86.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation marks and citations omitted); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013) (stating that this doubly deferential standard of review "gives both the state court and the defense attorney the benefit of the doubt"). "The question [on federal habeas review of an ineffective-assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

### C.    Exhaustion of State Remedies; Procedural Default

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly

presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

## IV.   Discussion

### A.   Ground One

Moak argues that trial counsel was ineffective for failing to move to suppress the statements he made during his interview with law enforcement. He alleges that, after Detective Graber read him his *Miranda* rights, he said he wanted an attorney.

According to Moak, Graber violated *Miranda* by continuing the interview despite his request for an attorney. In addition, Graber allegedly gave a "vague and evasive" answer to Moak's question about what would happen if he waived his constitutional rights and spoke to Graber. (Doc. 2, pp. 4-5.) In light of these alleged constitutional violations, Moak asserts that trial counsel should have moved to suppress all of his statements—a motion that was "very likely to succeed." (*Id.*, p. 7.) Instead, counsel merely sought redactions of "specific parts" of the statements and "inclusion of the rest." (*Id.*, p. 6.)

The state court denied Moak's claim that trial counsel was ineffective for not filing a motion to suppress:

> Defendant contends that his statements were obtained in violation of *Traylor v. State*, 596 So. 2d 957 (Fla. 1992) and *Almeida v. State*, [737 So. 2d 520 (Fla. 1999)], which prohibit law enforcement from giving evasive answers in response to a suspect's questions in order to "steamroller" the suspect into continuing on with a statement, rather than invoking his or her [] *Miranda* rights. Defendant cites in support to a portion in the transcript of his statement in which Defendant, after being *Mirandized*, asked Detective Graber to tell him what would happen if he gave up his rights and answered the Detective's questions. Defendant alleges that Graber's answer was evasive and designed to keep Defendant from remaining silent, and that his trial attorney should have moved to suppress his entire statement on this ground.
>
> . . .
>
> "[I]f, at any point during custodial interrogation, a suspect asks a clear question concerning his or her rights, the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer." *Murdock* [*v. State*], 115 So. 3d [1050,] 1055 [(Fla. 4th DCA 2013)] (quoting *State v. Glatzmayer*, 789 So. 2d 297, 303 (Fla. 2001) (quoting *Almeida v. State*, 737 So. 2d 520, 525 (Fla. 1999))). Misinformation or obfuscation in response to a suspect's question may make the confession involuntary if the answers caused the suspect to have

9

"unrealistic hope and delusions as to his [or her] true position." *Wilson v. State*, 242 So. 3d 484, 497 (Fla. 2d DCA 2018) (internal citations omitted); *accord Cuervo v. State*, 967 So. 2d 155, 165-66 (Fla. 2007) (finding effect of *Miranda* warning was rendered nullity where police confused suspect about the meaning of *Miranda* rights with obfuscating statements and questions). To warrant relief, the challenged conduct[] must arise to "outrageous behavior" that had a "causal nexus to the confession." *Wilson*, 242 So. 3d at 498; *accord Nelson v. State*, 850 So. 2d 514, 522 (Fla. 2003) (police misinformation must be "such a substantial misrepresentation as to automatically render [the] confession involuntary.").

Defendant cites to the following passage as evidence that he was mislead [*sic*] and tricked by Detective Graber's evasive answers into waiving his rights:

> Det. Graber: . . . Okay, Mister Moak. Uh, you do have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to an attorney and have him or her present with you before and during questioning. If you cannot afford to hire an attorney one will be appointed to represent you at no cost to you before and during questioning if you wish. You can decide at anytime [*sic*] to exercise these rights and not answer any questions or make any statements. Do you understand each of these right [*sic*] Mister Moak?
>
> Defendant: Yes, I do.
>
> Det. Graber: You do?
>
> Defendant: Yeah.
>
> Det. Graber: Okay. Having these in mind would you uh, tell me uh, what happened tonight?
>
> Defendant: No. I want an attorney.
>
> Det. Graber: You want an attorney? Okay. Okay. That will conclude the interview which didn't start. It's about one thirty. Okay.
>
> Defendant: Public Defender. I have no money.

Det. Graber: Okay.

Defendant: I know what I did is not nice.

Det. Graber: I'm just writing.

Defendant: I understand that, sir. I do understand.

Det. Graber: Okay. Alright.

Defendant: Let me ask you something. If I give up my rights to answer those questions.

Det. Graber: I'm sorry.

Defendant: I said if I give up that right

Det. Graber: Yes sir.

Defendant: to answer your questions where's that go from there?

Det. Graber: Where does it go from there? I mean you asked for an attorney for you to be able to [*sic*]. I'm just gonna ask you what happened. Okay? I mean, if you want to change your mind, I'll listen to what you have to say and we'll go from there. Obviously you are under arrest. You know that, correct?

Defendant: Absolutely I know I'm under (laughed). I know that!

Det. Graber: Okay. Well again if you want to tell your side of it and at this point, you know, feel free[;] otherwise I'll, I'm gonna walk out. (knock on door). Yeah. Give me one second.

Defendant: Yep.

Det. Graber: Okay. (Door opening/closing).

* * *

11

Det. Graber: (Door closing). Before I sit down. I know you. I'm sorry. I know you were trying to readdress the issue of actually maybe talking to me.

Defendant: Yeah I said, if I waive my rights what does, what does that mean?

Det. Graber: It means that I want to get your side of the story and that you're willing to talk to me knowing that, you know, I did read you your rights, but you still want to be able to explain to me what happened.

Defendant: Um.

Det. Graber: [I]s that something that you would like to do sir at this time?

Defendant: Yeah.

Det. Graber: Okay.

Male Voice: We'll read you your rights again. I want to make sure that you understand them. And this is, we're not holding anything back here and we're not gonna try to trick you into anything, you know. This is

Defendant: Okay.

Male Voice: this is your decision.

Defendant: I understand that. I, I truly understand that.

Male Voice: We're gonna

Defendant: Trust me. Look it. I've been cooperative all this

Male Voice: Yeah, you have.

Having reviewed this excerpt, the Court does not find that either Detective Graber, or the other deputy present in the interview room, made misleading, evasive, or coercive statements to Defendant. Detective Graber's explanation of what it meant to waive his *Miranda*

rights was not deceptive; it was, in fact, a "common sense" explanation that Defendant would be giving his version of events so that the deputies would understand his side, with the knowledge that he did not have to do so. *See Almeida v. State*, 737 So. 2d 520, 525 (Fla. 1999) (encouraging law enforcement officers to give "basic, common sense information" concerning suspect's right to counsel when asked by suspect, and not to ignore questions). Graber reminded Defendant [he] was under arrest. This disabused any misunderstanding that Defendant was a mere suspect. The fact that Graber asked Defendant if he wanted to give his version of the events was not improper, as encouraging a defendant to cooperate with law enforcement does not amount to coercive conduct. *See Martin* [*v. State*], 107 So. 3d [281,] 305 [(Fla. 2012)]; *Bussey v. State*, 184 So. 3d 1138, 1141 (Fla. 2d DCA 2015).

Moreover, the second deputy told Defendant that they wanted to ensure that he understood his rights; that the decision to answer questions was Defendant's to make; and that Defendant would be read his rights for a second time to ensure that he understood them. Courts have found that an officer's response, which reaffirmed a defendant's sole right to decide on whether to invoke his or her *Miranda* rights, was not a misleading or evasive answer, but in fact, an honest one. *See Glatzmayer*, 789 So. 2d at 305 (finding officer's response, informing defendant that it was his decision and he should make up his own mind about whether to obtain counsel, was "simple, reasonable, and true" answer to defendant's inquiry).

This case, consequently, is distinguishable from *Almeida*, *supra*, where officers ignored and avoided answering a defendant's direct question about the efficacy of having an attorney present. It is also dissimilar from cases involving deliberate attempts to mislead a defendant, such as in *Cuervo*, *supra*, where officers told a non-English-speaking defendant, after he invoked his right to remain silent, that there was "still time" to talk, thereby suggesting there was a window of time for vindication. In *Dooley v. State*, 743 So. 2d 65, 69 (Fla. 4th DCA 1999), officers improperly told the defendant that if he waived his *Miranda* rights at that time, it would not affect his ability to invoke his rights in the future, causing the defendant to be misled into believing he could prevent his statements from being used by invoking *Miranda* at a later late.

The Court was also able to observe the second *Mirandizing* of Defendant as recorded on State's trial Exhibit 15. Detective Graber clearly and distinctly read Defendant his rights, using a small card from his wallet,

while seated in a corner of the room. Defendant acknowledged that he understood his rights and said he was willing to give a statement. Defendant was clearly upset but not emotional at this point, and his interaction with the officers was lucid and conversational in tone. *Compare with DeConingh v. State*, 433 So. 2d 501, 502-04 (Fla. 1983) (finding confession involuntary based on psychological coercion where witnesses described defendant as upset, crying, confused, disoriented, under medication, and hysterical at time of questioning). Defendant expressed no hesitancy or confusion. Notably, he said things during the interview indicating his full awareness that he was making statements that would be used against him. For example, Defendant said, "And I know I'm hanging myself right now and I don't give a rat's ass. I know I'm hanging myself." "I'm not a f—king liar. . . I will stand up for what I f—king did and I'm a man." "But you know where I'm going to go? I know where I'm going to go. . . I'm going up to the big f—king house up there and get a f—king lethal injection. I already know it and I don't f—king care at this f—king point."

Counsel's statements to the trial court at the September 29, 2014, pretrial hearing make plain that counsel did not believe that Defendant's statement was involuntary, and that counsel intentionally decided not to file a motion to suppress it. The Court cannot conclude that this strategy fell outside the wide range of professionally competent assistance. Even had counsel filed such a motion, it would have been denied, so that Defendant cannot demonstrate resulting prejudice.

For all of these reasons, this claim is without merit.

(Doc. 13-5, Ex. 42, pp. 2-11 (record citations omitted).)

The state court reasonably rejected Moak's ineffective-assistance claim. To succeed on this claim, Moak was required to "make a strong showing that [his statement to police] would have been suppressed had counsel properly filed a motion [to suppress]." *Pineda v. Warden, Calhoun State Prison*, 802 F.3d 1198, 1203 (11th Cir. 2015). Moak failed to make the required showing. As the state court correctly concluded, Detective Graber and the other deputy in the room gave "simple and straightforward answer[s]" to Moak's question about his *Miranda* rights. *Almeida*, 737

So. 2d at 525. Graber explained that a *Miranda* waiver meant that he would "get [Moak's] side of the story and that [Moak was] willing to talk to [him] knowing that, you know, [he] did read [Moak his] rights, but [Moak] still want[ed] to be able to explain to [him] what happened." (Doc. 13-5, Ex. 42, p. 8.) The other deputy said that it was Moak's "decision" whether to waive his rights, and that he wanted to "make sure" Moak understood his rights before proceeding with questioning. (*Id.*) Nothing about these responses suggests that the deputies gave "evasive answer[s]," "skip[ped] over the question," or "steamroll[ed]" Moak. *Almeida*, 737 So. 2d at 525. Thus, any motion to suppress based on the deputies' responses would have been meritless.

Moak also contends that trial counsel could have sought to suppress his statements on the ground that the interview should have ended once he asked for a lawyer. This argument is meritless. "[A] statement made by a suspect in custody in response to police interrogation is inadmissible against him at trial unless the police first advised him of his so-called *Miranda* rights, including the right to remain silent and the right to an attorney, and he knowingly and voluntarily waived those rights." *Lukehart v. Sec'y, Fla. Dep't of Corr.*, 50 F.4th 32, 42-43 (11th Cir. 2022) (citing *Miranda*, 384 U.S. at 484-85). "Once a suspect invokes his right to an attorney, police interrogation must stop 'until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*'" *Id.* (emphasis added) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)). "A defendant 'initiates' further conversation with law enforcement when his statements evidence 'a willingness and a desire for a generalized discussion about the

investigation.'" *United States v. Roper*, 842 F. App'x 477, 480 (11th Cir. 2021) (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983)).

Here, Moak initially invoked his right to counsel, telling Detective Graber that he "want[ed] an attorney." (Doc. 13-5, Ex. 42, p. 7.) Graber then ended the interview and began writing something down. Without any prompting, Moak asked Graber, "If I give up my rights to answer those questions," "where's that go from there?" (*Id.*, pp. 7-8.) Graber answered the question, re-advised Moak of his rights, and confirmed his waiver of those rights before proceeding with questioning. Thus, the state-court record reflects that Graber appropriately ended the interview when Moak invoked his right to counsel, and that Moak himself initiated further conversation with law enforcement. *See Bassett v. Singletary*, 105 F.3d 1385, 1387 (11th Cir. 1997) (holding that, after invoking "his right to counsel," defendant "initiated further conversation by inquiring 'well, what do you want, anyway?'"). Faced with this record, the trial court would have denied a motion to suppress that raised the argument that Graber violated *Miranda* by continuing the interview. Trial counsel cannot be deemed ineffective where, as here, he fails to raise a meritless argument. *See Williams v. Sec'y, Fla. Dep't of Corr.*, No. 21-12871-J, 2022 WL 520202, at *1 (11th Cir. Feb. 9, 2022) ("Any motion to suppress would have been meritless because the record shows that detectives ceased the interrogation after Mr. Williams expressed his desire for a lawyer, he reinitiated the conversation, and the detectives re-advised him of his rights and obtained a second waiver form before proceeding with the interrogation. As such, counsel's performance was not deficient for failing to raise a meritless argument." (citations omitted)).

16

In sum, Moak does not show that the state court's ruling involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination. Thus, he is not entitled to relief on Ground One.

### B.    Ground Two, Sub-Claim A

Moak contends that the trial court "abused its discretion" by admitting the portion of his confession in which Detective Graber advised him of his *Miranda* rights and he waived those rights.[3] (Doc. 2, p. 7.) According to Moak, the State used the advisement and waiver of his *Miranda* rights to rebut his primary defense at trial—namely, that he was insane when he committed the murders. Moak contends that the admission of this portion of the confession violated his federal due process rights, rendering the trial fundamentally unfair.

Respondent argues that Moak failed to exhaust this claim in state court. Respondent acknowledges that both before and during trial, Moak "objected to all portions of the videotaped statement discussing [his] rights and his waiver of rights." (Doc. 12, p. 35.) Respondent also concedes that, on direct appeal, Moak "again argued that the trial court abused its discretion by admitting the portion of the statement discussing [his] rights and his waiver of rights." (*Id.*) Respondent contends, however, that Moak never argued in state court that "admission of the statements would violate his federal due process rights or render his trial fundamentally unfair." (*Id.*) Thus,

---

[3] As noted above, after Moak initiated further discussions with the deputies, Graber re-read Moak his *Miranda* rights. Graber then asked Moak whether he understood those rights, and Moak said he did. Moak then indicated that he would "talk to [Graber]." (Doc. 13-17, Ex. 53, p. 280.)

according to Respondent, Moak failed to "alert the state court [to] the federal nature of his claim." (*Id.*)

The Court concludes that Moak exhausted this claim. To properly exhaust a claim, a petitioner "must fairly present [the] claim in each appropriate state court . . ., thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). "A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Id.* at 32. A petitioner fairly presents a federal claim by citing a state case that "decid[es] such a claim on federal grounds." *Wells v. Sec'y Dep't of Corr.*, 343 F. App'x 581, 584 (11th Cir. 2009) (holding that petitioner fairly presented federal claim where he "cited and discussed only one case," a "Florida appellate [decision]" that resolved claim on federal constitutional grounds).

Before the state trial court, Moak did not cite any federal cases in opposing admission of the advisement and waiver of his *Miranda* rights. Nor did he expressly argue that admission of this evidence would violate federal law. The same is true of Moak's arguments on direct appeal. Nevertheless, at both the trial-court and appellate levels, Moak relied on *State v. Burwick*, 442 So. 2d 944 (Fla. 1983), a Florida Supreme Court decision that rested in part on federal constitutional grounds. (Doc. 13-1, Ex. 17, p. 2; Doc. 13-4, Ex. 36, p. 6.) *Burwick* held that the government may not rebut an insanity defense by introducing evidence that, after receiving *Miranda* warnings, a

defendant chose to remain silent or asked for an attorney. 442 So. 2d at 945. The Florida Supreme Court reasoned that it would be "fundamentally unfair for the state to lure [a defendant] into remaining silent then impeach the man with this very same silence." *Id.* at 948. According to the court, "[t]o permit the state to benefit from the fruits of its own deceptions [would] violate[] the due process clause of the fourteenth amendment and article I, section 9, of the Florida Constitution." *Id.* Because *Burwick* rested in part on federal due process grounds, Moak's citation of that decision was sufficient to alert the state courts to the federal nature of his claim. *See Turner v. Inch*, No. 3:17-cv-869-RV-EMT, 2019 WL 2527576, at *7 (N.D. Fla. May 6, 2019) ("Petitioner cited at least two Florida state cases which resolved the due process issue on federal grounds. . . . The undersigned concludes this was sufficient to alert the First DCA to the federal nature of Petitioner's claim, and thus satisfied the 'fair presentation' requirement."), *adopted by* 2019 WL 2526190 (N.D. Fla. June 19, 2019).

Although Moak fairly presented this claim in state court, he is not entitled to relief because he cannot show that the state court's rejection of the claim was objectively unreasonable. "[F]ederal courts will not generally review state trial courts' evidentiary determinations." *Taylor v. Sec'y, Fla. Dep't of Corr.*, 760 F.3d 1284, 1295 (11th Cir. 2014). "Indeed, in a habeas corpus action brought by a state prisoner, [the court's] authority is severely restricted in the review of state evidentiary rulings." *Id.* "Habeas relief is warranted only when the error so infused the trial with unfairness as to deny due process of law." *Id.*; *see also Mills v. Singletary*, 161 F.3d 1273, 1289 (11th Cir. 1998) ("We will not grant federal habeas corpus relief based on an evidentiary

ruling unless the ruling affects the fundamental fairness of the trial."). "A denial of fundamental fairness occurs whenever the improper evidence is material in the sense of a crucial, critical, highly significant factor." *Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir. 1998).

Moak cannot meet this "high bar." *Taylor*, 760 F.3d at 1296. He contends that the trial court violated his federal due process rights by admitting the portion of the confession in which he was advised of—and waived—his *Miranda* rights. To be sure, the Supreme Court has held that a defendant's due process rights are violated if the government uses his "silence after receiving *Miranda* warnings [as] evidence of his sanity." *Wainwright v. Greenfield*, 474 U.S. 284, 285, 295 (1986). *Greenfield* rested on the premise that, "when post-*Miranda* warnings silence is used to prove sanity," the government breaches its "implied promise . . . that silence will carry no penalty." *Id.* at 293, 295; *accord Burwick*, 442 So. 2d at 947-48 (holding that, when the government "rebut[s] the defense of insanity with evidence . . . of a defendant's desire to remain silent and his request for an attorney," it breaches the "assurances contained within the *Miranda* warning").

Here, however, the State agreed that Moak's initial invocation of his *Miranda* rights would *not* be admitted at trial. (Doc. 13-7, Ex. 50, p. 11.) And Moak's invocation of his rights was omitted from the recording of the confession that was played at trial. (*Id.*, Ex. 53, pp. 273, 280.) Thus, there is no basis to conclude that the trial court violated *Greenfield*'s bar on the use of post-*Miranda* silence to rebut an insanity defense.

Nor is there any support for Moak's argument that due process forbade the jury from hearing that he was subsequently re-advised of (and waived) his *Miranda* rights. Moak has not cited—and the Court cannot locate—any authority suggesting that a defendant's due process rights are violated if a trial court admits evidence that he was informed of his *Miranda* rights and chose to waive them. *Cf. United States v. Bailey*, 957 F.2d 439, 442 (7th Cir. 1992) ("FBI agents described [at trial] the conditions surrounding Bailey's confession to show it was not coerced. They testified that *Miranda* warnings were given and that Bailey waived his rights without requesting counsel.").

Moreover, the advisement and waiver of Moak's *Miranda* rights were relevant to the voluntariness of his confession. The trial court, using Florida's pattern jury instruction on a defendant's out-of-court statements, instructed the jury that "[a] statement claimed to have been made by the defendant outside of court has been placed before you. Such a statement should always be considered with caution and be weighed with great care to make certain that it was freely and voluntarily made. Therefore, you must determine from the evidence that the defendant's alleged statement was knowingly, voluntarily, and freely made." (Doc. 13-7, Ex. 57, p. 682 (citing Fla. Std. Jury Instr. (Crim.) 3.9(b)).) Whether a defendant was advised of—and waived—his *Miranda* rights is plainly relevant to the voluntariness of his statements. *See United States v. Jones*, 32 F.3d 1512, 1517 (11th Cir. 1994) (noting, as one factor supporting a finding of voluntariness, that defendant "was advised of his *Miranda* rights twice" and "signed a waiver of rights form").

For these reasons, Moak fails to establish that the admission of the advisement and waiver of his *Miranda* rights "affect[ed] the fundamental fairness of the trial." *Singletary*, 161 F.3d at 1289. The state court's resolution of his claim was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Moak is not entitled to relief on Ground Two, Sub-Claim A.

### C.    Ground Two, Sub-Claim B

Moak contends that the trial court erroneously prevented the jury from hearing the first part of the recording of his interview with law enforcement. During this part of the recording, Moak was allegedly "locked in the interrogation room by himself and was not aware that his behavior was being recorded." (Doc. 2, p. 9.) According to Moak, the redacted portion of the recording "clearly show[s] that he was extremely disoriented and that his behavior was borderline psychotic during the period of time immediately following the" murders. (Doc. 1, p. 7.)

Respondent correctly argues that Moak failed to exhaust this claim. Shortly before trial, Moak sought to admit the "preliminary portion" of the recording, in which he was "sitting for a period of time and . . . making statements." (Doc. 13-7, Ex. 49, p. 49.) Moak argued that this part of the recording supported his insanity defense. The "preliminary portion" of the recording was ultimately removed from the tape that was played to the jury. On direct appeal, however, Moak did *not* challenge the exclusion of this portion of the recording. (Doc. 13-4, Exs. 36, 38.) Proper exhaustion requires "state prisoners [to] give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established

appellate review process." *Boerckel*, 526 U.S. at 845. Because Moak failed to raise this claim on appeal, he did not properly exhaust it.

Moak cannot return to state court to present his claim in a second, untimely direct appeal. *See* Fla. R. App. P. 9.140(b)(3) (stating that a notice of appeal must be filed within thirty days of the rendition of a sentence). As a result, Ground Two, Sub-Claim B is procedurally defaulted. *See Smith*, 256 F.3d at 1138 ("If the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established."). Moak does not argue that an exception applies to overcome the default. Thus, Ground Two, Sub-Claim B is barred from federal habeas review and affords Moak no relief.[4]

**D.    Ground Three**

Moak argues that the trial court violated his due process rights by denying his request that an insanity instruction be added to the introduction-to-homicide instruction, which was read for each of the three counts. The trial court gave the jury Florida's pattern instruction on the insanity defense. (Doc. 13-7, Ex. 57, p. 677-78 (citing Fla. Std. Jury Instr. (Crim.) 3.6(a)).) But the trial court denied Moak's request for a special instruction—namely, that a separate reference to the insanity defense be

---

[4] In his petition, Moak appears to suggest that his statement to law enforcement was "redacted and/or suppressed by defense counsel." (Doc. 1, p. 7.) To the extent that Moak seeks to raise an ineffective-assistance claim based on this allegation, it is unexhausted because he never raised it in state court. Because Moak cannot return to state court to present this claim in a second, untimely postconviction motion, *see* Fla. R. Crim. P. 3.850(b), the claim is procedurally defaulted. Additionally, Moak does not contend that an exception applies to overcome the default.

added to each of the three introduction-to-homicide instructions. As a result, Moak argues, "the trial court read the insanity instruction only one time to include all three victims, but then read the instruction for [] introduction to homicide . . . three times, once for each victim." (Doc. 2, p. 13.) Moak contends that the trial court's failure "to instruct the jury on the insanity defense after each victim deprived [him] of a fair trial and denied him Due Process." (*Id.*)

Respondent correctly argues that Moak failed to exhaust this claim. To be sure, Moak asked the trial court to read a special insanity instruction as part of the three introduction-to-homicide instructions. (Doc. 13-4, Exs. 25, 26, 27.) And, on direct appeal, Moak argued that "it was an abuse of discretion for the [trial] court to deny [his] request that the insanity defense be added to the jury instructions for Introduction to Homicide and Manslaughter, which was read after each victim." (Doc. 13-4, Ex. 36, p. 5.) But Moak never argued in state court that the failure to give the requested instruction would violate the federal constitution. He did not cite any source of federal law, and none of the Florida cases he relied on decided the jury-instruction claims on federal grounds. (*Id.*, p. 9 (citing *Stephens v. State*, 787 So. 2d 747 (Fla. 2001); *Brown v. State*, 11 So. 3d 428 (Fla. 2d DCA 2009); *Aumuller v. State*, 944 So. 2d 1137 (Fla. 2d DCA 2006)).) Thus, Moak failed to "make the state court aware that the [jury-instruction] claim[] present[ed] federal constitutional issues." *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 457 (11th Cir. 2015); *see also Bing v. Sec'y, Fla. Dep't of Corr.*, No. 8:13-cv-1449-CEH-AEP, 2016 WL 5373480, at *5 (M.D. Fla. Sept. 26, 2016) ("If [petitioner] wanted to claim that the trial court's jury instructions denied him the due

process of law guaranteed by the Fifth and Fourteenth Amendments, he should have said so in his state court brief.").

Moak cannot return to state court to present his claim in a second, untimely direct appeal. *See* Fla. R. App. P. 9.140(b)(3). As a result, Ground Three is procedurally defaulted. *See Smith*, 256 F.3d at 1138. Moak does not argue that an exception applies to overcome the default. Thus, Ground Three is barred from federal habeas review and affords Moak no relief.

### E.    Ground Four

Moak contends that appellate counsel was ineffective because, on direct appeal, he failed to raise an ineffective-assistance-of-trial-counsel claim.[5] The trial-level ineffectiveness claim rests on Moak's assertion that trial counsel had "insufficient time to prepare for both the trial and the sentencing phases" of the case. (Doc. 1, p. 11.) Moak alleges that his original attorney withdrew from the case shortly before trial "due to having a large caseload."[6] (*Id.*) He claims that, on September 25, 2014—eleven days before trial began—the State's forensic psychologist (Dr. John Super) conducted a psychological evaluation of him. Trial counsel did not receive the evaluation until

---

[5] In Florida, claims of ineffective assistance of trial counsel are not cognizable on direct appeal unless "(1) the ineffectiveness is apparent on the face of the record, and (2) it would be a waste of judicial resources to require the trial court to address the issue [on postconviction review]." *Robards v. State*, 112 So. 3d 1256, 1266-67 (Fla. 2013).

[6] The state-court record does not indicate when exactly trial counsel began representing Moak. Trial began on October 6, 2014. Two months earlier—on August 11, 2014—trial counsel had filed an amended notice of intention to rely upon the defense of insanity. (Doc. 13-1, Ex. 9.) This notice was the first filing in the case that was signed by trial counsel rather than Moak's initial counsel. Accordingly, it appears that trial counsel began representing Moak at least two months before trial.

September 29. Then, on October 3, trial counsel deposed Dr. Super. Trial counsel did not receive a copy of the transcript until October 6, the first day of trial. Moreover, Moak alleges that trial counsel had only seventeen days to arrange for six witnesses to testify on his behalf at trial. Based on these allegations, Moak contends that the ineffectiveness of his trial counsel "should have been raised on direct appeal." (*Id.*)

Moak exhausted this claim by raising it in his petition alleging ineffective assistance of appellate counsel. (Doc. 13-7, Ex. 48, p. 5-6.) The state appellate court summarily denied the petition in a one-sentence order.[7] (*Id.*, Ex. 49.) Where, as here, "a state court's decision is unaccompanied by an opinion explaining the reasons relief has been denied," the court presumes "that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 98-99. Thus, under *Richter*, Moak's "burden is to demonstrate that there was no reasonable basis for the decision of the [state appellate court] to deny his claim." *Tarleton v. Sec'y, Fla. Dep't of Corr.*, 5 F.4th 1278, 1291 (11th Cir. 2021).

Moak has not met his burden. "[T]o determine whether [a petitioner] has shown ineffective appellate counsel, [the court] must determine whether [he] has shown underlying meritorious ineffective-trial-counsel claims." *Payne v. Allen*, 539 F.3d 1297, 1314 (11th Cir. 2008). The state appellate court could reasonably have concluded that

---

[7] "Florida law requires that an ineffective-assistance-of-appellate-counsel claim 'be raised by petition for writ of habeas corpus in the appellate court which considered the appeal.'" *Pierre v. Dixon*, No. 20-60760-CIV, 2022 WL 3549781, at *7 (S.D. Fla. Aug. 18, 2022) (quoting *Simpson v. State*, 617 So. 2d 749, 749 (Fla. 1st DCA 1993)).

Moak had failed to establish an "underlying meritorious ineffective-trial-counsel claim[]." *Id.* Specifically, Moak never explained what trial counsel could (or should) have done if he had had additional time to prepare for trial. For example, Moak did not identify any witnesses who should have been (but were not) contacted. Nor did he point to any exculpatory evidence that could have been uncovered with additional time to prepare. Instead, Moak listed several steps trial counsel took in the lead-up to trial, then vaguely asserted that trial counsel was "rushed" and "not prepared." (Doc. 13-7, Ex. 48, pp. 5-6.) The state appellate court could reasonably have found that Moak's conclusory allegations of inadequate preparation were insufficient to show deficient performance or prejudice under *Strickland*. *See McNeal v. Cosby*, No. 8:04-cv-505-EAK-EAJ, 2006 WL 314512, at *1 (M.D. Fla. Feb. 9, 2006) (holding that petitioner had "neither shown any deficient performance nor prejudice to his trial required under *Strickland*" because he failed to "describe[] [any] additional investigation [that] should have been done" by counsel, who was appointed shortly before trial). And because Moak failed to advance a meritorious trial-level ineffectiveness claim, the state appellate court could reasonably have concluded that his ineffective-assistance-of-appellate-counsel claim failed as well.

In short, Moak has failed to show that "there was no reasonable basis for the decision of the [state appellate court] to deny his claim." *Tarleton*, 5 F.4th at 1291. Accordingly, he is not entitled to relief on Ground Four.

### F.   Ground Five

Moak argues that trial counsel was ineffective for failing to object to certain remarks the prosecutor made during closing argument. Moak contends that the prosecutor "acted as an expert witness, testifying before the jury as to what does or does not constitute legal insanity by providing her opinion regarding [Moak's] state of mind at the time of the crime." (Doc. 1, p. 13.) According to Moak, the prosecutor "described a detailed sequence of events in which she repeatedly interjected her opinion of specific thoughts and reasoning for deliberate actions that she assumed [Moak] had made during the commission of the crime." (*Id.*)

Respondent correctly contends that Moak failed to exhaust this claim. In his Rule 3.850 motion for postconviction relief, Moak did not argue that trial counsel was ineffective for failing to object to the prosecutor's comments during closing argument. True, in his petition alleging ineffective assistance of appellate counsel, Moak asserted that *appellate* counsel was ineffective because, on direct appeal, he did not raise an ineffective-assistance-of-trial-counsel claim concerning the failure to object to the prosecutor's closing argument. (Doc. 13-7, Ex. 48, pp. 7-10.) But Moak's "ineffective assistance of appellate counsel claim did not exhaust his claim of ineffective assistance of trial counsel, which is the claim raised in the instant petition." *Au v. Buss*, No. 2:11-cv-103-JES-CM, 2014 WL 842446, at *11 (M.D. Fla. Mar. 4, 2014); *see also Sicola v. Dep't of Corr.*, No. 8:18-cv-486-KKM-TGW, 2021 WL 9528089, at *9 (M.D. Fla. May 14, 2021) (rejecting petitioner's argument that he exhausted ineffective-assistance-of-

trial-counsel claim by "present[ing] this ground to the state court in his state Rule 9.141(d) motion alleging ineffective assistance of appellate counsel").

Moak cannot return to state court to present this claim in a second, untimely postconviction motion. *See* Fla. R. Crim. P. 3.850(b) (imposing two-year window of time to file motion for post-conviction relief). As a result, Ground Five is procedurally defaulted. *See Smith*, 256 F.3d at 1138. Moak does not argue that an exception applies to overcome the default. Thus, Ground Five is barred from federal habeas review and affords Moak no relief.

Even if Moak had not defaulted this claim, he would not be entitled to relief. Moak contends that trial counsel should have objected to the following portion of the prosecutor's closing argument:

> He made a deliberate choice to get up out of bed and go out there. He made a deliberate choice to return and take the gun from under his bed and to load it. And you can use your common sense and logical inferences from the evidence that you saw, and that box of ammo was sitting there on his nightstand. If that gun was loaded, he didn't need to get that box of ammo out.

> So he loaded his gun and he walked out to the lanai. Actually, he stood in the living room. And we know that because he told us so himself. He stood in the living room and he pointed that gun at his sister. He aimed it, he thought about it, pulled the trigger, and he shot his sister, Renee, in the head.

> But he's not done yet. The fight wasn't going on when he killed Renee. The fight was already over because he told us so himself that his dad was at the entrance to the bedroom, standing in the doorway. And so what does he do after he kills his sister and he sees her body slumped over in the chair? He walks into another room and he stands there and, again, he takes aim, pulls the trigger, and he shoots his 82-year old father in the head and then he shoots him four more times.

He's not finished yet. The fight's over. There's no more fighting going on. What does he do? He shoots his 84-year old mother lying helpless in her bed. He shoots her in the head, too, and then he shoots her three more times.

Ladies and gentleman, being sad and worried about your son in Afghanistan does not equal insanity and it doesn't give you the license to kill your family. Being depressed because you are dependent upon your elderly parents for a place to live does not equal insanity and it doesn't give you a license to kill them because they annoy you and they wake you up at night. And being upset because your sister is mean to you does not give you the license to kill her and it does not equal insanity.

(Doc. 13-7, Ex. 57, pp. 692-93.)

Trial counsel was not ineffective because there was no basis to object to the prosecutor's comments. *See Freeman v. Atty. Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim . . . ."). "Attorneys are permitted wide latitude in closing argument, but that latitude does not extend to allowing improper argument." *Silvia v. State*, 60 So. 3d 959, 977 (Fla. 2011). "The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence." *Id.* Here, the prosecutor's description of the murders came largely from Moak's own statement to the police. It was a "logical inference[]" from the confession and the other evidence presented at trial that Moak deliberately chose to retrieve the rifle from under his bed and shoot his parents and sister. *Smith v. State*, 7 So. 3d 473, 509 (Fla. 2009).

Likewise, there was nothing improper about the prosecutor's comments regarding the insanity defense. Although a prosecutor may not "denigrate[] the insanity defense in general," she may "argue to the jury that based on all the facts, [a

defendant's] reliance on an insanity defense [is] incredible." *Blaylock v. State*, 537 So. 2d 1103, 1108 (Fla. 3d DCA 1988); *see also Ruiz v. State*, 80 So. 3d 420, 422 (Fla. 4th DCA 2012) ("Contrary to Ruiz's assertion, the prosecutor did not belittle Ruiz's insanity defense, but rather noted the substantial evidence that contradicted his defense."). Here, the prosecutor did not "denigrate[] the insanity defense in general." *Blaylock*, 537 So. 2d at 1108. Instead, she permissibly argued that the evidence Moak presented at trial did not establish that he was insane at the time of the murders. *See Mignotte v. State*, 576 So. 2d 809, 811 (Fla. 3d DCA 1991) (holding that "prosecutor's remarks did not constitute an impermissible denigration of the insanity defense" because prosecutor merely argued that "in this case, the defense was inapplicable" (emphasis omitted)); *see also Patton v. State*, 878 So. 2d 368, 375 (Fla. 2004) ("[A] defendant can be found not guilty by reason of insanity if he or she commits an unlawful act, but by reason of a mental infirmity, disease, or defect is unable to understand the nature and quality of his or her act, or its consequences, or is incapable of distinguishing right from wrong at the time of the incident.").[8]

## G. Ground Six

Moak argues that trial counsel was ineffective for "proceed[ing] to trial without securing a psychiatrist or other such expert to assist in the defense at trial." (Doc. 1, p.

---

[8] Moak appears to raise a new claim in his reply, arguing that trial counsel was ineffective for waiving closing argument. (Doc. 14, p. 3.) Moak "cannot bring new claims in his reply." *Grant v. Sec'y, Dep't of Corr.*, No. 8:16-cv-1978-WFJ-SPF, 2019 WL 3718673, at *12 (M.D. Fla. Aug. 7, 2019) (collecting cases). In any event, Moak failed to exhaust this claim, which is now procedurally defaulted because he cannot return to state court to present it in a second, untimely postconviction motion. *See* Fla. R. Crim. P. 3.850(b). Moreover, Moak does not argue that an exception applies to overcome the default.

14.) According to Moak, trial counsel's failure to retain such an expert "denied [him] a fair trial" because "there was no witness to refute the testimony of the State[']s expert." (*Id.*)

As Respondent correctly notes, Moak did not exhaust this claim. In his Rule 3.850 motion for postconviction relief, Moak did not argue that trial counsel was ineffective for failing to retain a psychiatric expert. Nor did he raise this claim on appeal from the order denying his motion for postconviction relief. Moak cannot return to state court to present this claim in a second, untimely postconviction motion. *See* Fla. R. Crim. P. 3.850(b). As a result, Ground Six is procedurally defaulted. *See Smith*, 256 F.3d at 1138. Moak does not argue that an exception applies to overcome the default. Thus, Ground Six is barred from federal habeas review and affords Moak no relief.

It is therefore **ORDERED** that Moak's petition (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against Moak and to **CLOSE** this case.

<u>**Certificate of Appealability**</u>
<u>**and Leave to Appeal *In Forma Pauperis* Denied**</u>

It is further **ORDERED** that Moak is not entitled to a certificate of appealability ("COA"). A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a COA must first issue. *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To obtain a COA, Moak must show that reasonable jurists would find debatable both (1) the merits of

the underlying claims and (2) the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Moak has not made the requisite showing. Finally, because Moak is not entitled to a COA, he is not entitled to appeal *in forma pauperis*.

**ORDERED** in Tampa, Florida, on February 7, 2023.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE